**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| CALEB J. ARCE, | ) | CASE NO. 3:25-CV-2372 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Caleb J. Arce's application for a period of disability and Disability Insurance Benefits (DIB). Mr. Arce seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Nov. 4, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

In July 2023, Mr. Arce applied to the Social Security Administration (SSA) seeking a period of disability and DIB benefits; he initially claimed that he became disabled on August 16, 2019, but the alleged onset date was later amended to November 21, 2020. (Tr. 208, 43.)[1] He identified five allegedly disabling conditions: (1) post-traumatic stress disorder; (2) heart disease; (3) social anxiety; (4) depression; and (5) diverticulitis. (Tr. 224.)

[1] The administrative transcript appears at ECF No. 7. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 33"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1481").

The SSA denied Mr. Arce's application initially and upon reconsideration. (Tr. 87–89, 97.) Mr. Arce requested a hearing before an administrative law judge (ALJ). (Tr. 123.) Mr. Arce's counsel submitted a brief in advance of the hearing. (Tr. 315–21.) The ALJ held a hearing on October 8, 2024, at which Mr. Arce was represented by counsel. (Tr. 40–58.) Mr. Arce testified, as did an independent vocational expert (VE). (*Id.*)

On February 21, 2025, the ALJ issued a written decision finding that Mr. Arce was not disabled. (Tr. 14–34.) Mr. Arce requested review of the ALJ's decision. (Tr. 202–04.)

On September 10, 2025, the Appeals Council denied review. (Tr. 1.)

On November 4, 2025, Mr. Arce filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Arce asserts the following assignments of error for review:

> **First Assignment of Error:** SSR 24-3p is contrary to law and was promulgated in excess of Agency authority.
>
> **Second Assignment of Error:** The ALJ's RFC determination is the product of legal error because the ALJ failed to properly evaluate Plaintiff's subjective complaints pursuant to SSR 16-3p and 20 C.F.R. §§ 404.1529, 416.989, leaving the Court unable to proceed to a substantial evidence review.

(Pl.'s Merit Br. at 4, 22, ECF No. 9, PageID# 1481, 1499.)

## III. BACKGROUND

### A. Previous Applications for Social Security Benefits

Mr. Arce previously applied for a period of disability and DIB benefits, alleging disability beginning on October 11, 2019. (*See* Tr. 62.) In November 2020, an ALJ issued a decision denying the application. (Tr. 59.) The Appeals Council denied review of that decision. (Tr. 75.)

### B. <u>Personal, Educational, and Vocational Experience</u>

Mr. Arce was born in October 1975 and was 47 years old on the date of his application. (Tr. 44, 208.) He completed the eleventh grade but has not graduated from high school. (Tr. 44.) He has previous work as a general laborer in the food and automotive industries. (Tr. 225; *see also* Tr. 263–64.) He lives with his wife and an adult son, who is disabled. (Tr. 43–44.) He has a driver's license, but he reported that he stopped driving in approximately October 2023. (Tr. 44.)

### C. <u>Function Reports</u>

As part of his application, Mr. Arce wrote to the Agency that his anxiety had "worsened to the point that [he] cannot complete shifts at work, cannot finish the drive home without pu[l]ling over and [was] afraid to go out to stores and other places where there are crowds of people." (Tr. 232.)

Mr. Arce completed a function report in support of his disability application in August 2023. (Tr. 243–61.) He wrote that he is physically limited because of his "heart issue." (Tr. 243.) He wrote that his PTSD makes it hard to be around people. (*Id.*) He described that he "freak[s] out" and goes "into fight or flight mode." (*Id.*)

After he wakes up, he takes medicine and then cares for his son, who is disabled. (Tr. 244.) Sometimes he cleans and watches television. (*Id.*; *see also* Tr. 254.) He finds himself "constantly looking out windows" and calling all his children to make sure everyone is okay. (Tr. 244.) His mind is "constantly racing" and he has nightmares. (*Id.*) His wife helps care for their son and takes care of their pets. (*Id.*) His wife prepares all the meals. (Tr. 245.)

Mr. Arce identified that he sometimes stays in the same clothes for a couple days. (Tr. 244.) He sometimes needs reminders to bathe and see to his personal hygiene. (*Id.*) He also needs to be reminded to take medicine. (*Id.*)

Mr. Arce cleans, washes dishes, and vacuums. (Tr. 245.) He goes outside twice a day. (Tr. 246.) He used to collect Hot Wheel cars, but he has stopped going out to look for them because he no longer goes out in public. (Tr. 247.) He goes to family members' houses every few days. (*Id.*)

Mr. Arce wrote that he has "anger issues" and is irritable. (*Id.*) He has difficulty falling asleep and staying asleep. (Tr. 252.)

Mr. Arce identified that he cannot lift more than 25 pounds. (Tr. 248.) He has a hard time completing tasks or concentrating. (*Id.*) He does not handle stress or changes in routine. (Tr. 249.) He described "episodes" of PTSD at work and while driving. (Tr. 250.) His symptoms caused him to lose two jobs. (*Id.*) When his phone rings, he feels anxious to the point of feeling sick. (*Id.*)

In December 2023, Mr. Arce wrote to the Agency that his condition had worsened since July 2023. (Tr. 270–79.)

### D. <u>Relevant Hearing Testimony</u>

#### *1. Mr. Arce's Testimony*

Mr. Arce testified that he has post-traumatic stress disorder and experiences "episodes" when he has tried to work. (Tr. 45.) He explained that, when management employees would come out to his work site, he would "get manic" and go into "fight or flight mode." (Tr. 45–46.) He has difficulties concentrating because his mind is "constantly running" such that it is hard for him to stay focused on tasks. (Tr. 46.) He bounces between tasks. (*Id.*) He is "on a list to see therapists." (Tr. 49.) He tends to panic in crowds (Tr. 50), and he finds himself getting angry at coworkers over "little stuff." (Tr. 51.) He smokes marijuana to calm his anxiety, but he does not have a prescription for that. (*Id.*)

Mr. Arce testified that he has difficulty getting out of bed; sometimes he sleeps all day. (*Id.*) When he does get out of bed, he will try to stretch and then watch television. (*Id.*) He naps after he takes his medication, and then he waits for his wife to get home. (*Id.*)

Mr. Arce testified that he had a heart attack and fell out of the shower. (Tr. 48.) He described that he had "scorpioned" his back, causing slipped discs. (*Id.*) He estimated that he can walk about 20 feet before needing to take a break. (Tr. 45.) He can stand for about 15 minutes at a time. (*Id.*) He cannot bend at the waist. (*Id.*) He has to bend at the knees. (*Id.*) Mr. Arce explained that these limitations had developed over the past year, as his back issues have grown gradually worse. (*Id.*) He has trouble getting dressed because of back issues. (Tr. 46–47.) He recently began treating with a back surgeon; the surgeon wants him try injections, but it is Mr. Arce's understanding that he will need surgery soon. (*Id.*) He gets "winded" when he climbs a long flight of stairs. (Tr. 50.) When he sits for too long, his back grows stiff and then he needs to take a break and stand. (Tr. 52.)

Mr. Arce's medications cause him to frequently need to urinate. (Tr. 47.) They make him drowsy as well, such that he finds that he needs to nap around an hour after taking them. (*Id.*) He usually takes two naps per day. (Tr. 47–48.)

Mr. Arce does not do household chores or cook, but he can prepare himself a bowl of cereal. (Tr. 48.) He finds that he sometimes has trouble lifting a gallon of milk. (*Id.*) He does not shop for groceries, as he finds that he has a slow gait and cannot keep up with his wife. (Tr. 50.)

***2. Vocational Expert's Testimony***

Rebecca Williamson testified as a vocational expert (VE) at the hearing. (Tr. 53.)

The ALJ asked the VE to assume that a hypothetical individual with Mr. Arce's age and education had the capacity to work at the light exertional level with a number of other limitations. (Tr. 53.) Specifically, the individual can never climb ladders, ropes, or scaffolds but can frequently

climb ramps and stairs. (*Id.*) They can occasionally crawl and use the bilateral lower extremities for the operation of foot controls. (*Id.*) They must avoid concentrated exposure to moving mechanical parts and high exposed placed. (Tr. 53–54.) They can have no more than occasional concentrated exposure to irritants like fumes, odors, dust, and gases. (Tr. 54.) They can understand, remember, and carry out simple instructions for work not requiring a specific production rate pace (like assembly line work) or hourly quotas. (*Id.*) They are capable of using judgment to make simple, work-related decisions with occasional changes in a routine work setting. (*Id.*) They can have no interaction with the general public. (*Id.*) They must perform isolated work, but they can tolerate occasional interaction with coworkers and supervisors. (*Id.*) The ALJ further explained that the person primarily must be working alone, but there may be other individuals in the vicinity, and there can be occasional interaction with a supervisor that would be directing the work. (*Id.*)

The VE testified that such a person could perform the work of a merchandise marker (DOT 209.587-034), routing clerk (DOT 222.687-022), or mail clerk (DOT 209.687-026). (Tr. 55.)

The ALJ next asked the VE to assume that the person would also need a sit/stand option, such that they are able to sit or stand, alternating positions for one or two minutes in the immediate vicinity of the workstation every 30 minutes. (*Id.*)

The VE testified that those three jobs would remain, but the available number of jobs at each position would be reduced by 50 percent. (*Id.*)

The ALJ next asked the VE to assume that the same hypothetical person would be limited to the sedentary exertional level, with all the other specific limitations mentioned in the previous hypotheticals. (Tr. 56.) The VE confirmed that there would be no work available to someone so limited. (*Id.*)

The VE testified that employers tolerate employees who are off task for up to 10 percent of the workday. (*Id.*) During a short probationary period, employers will tolerate one or two absences per month, but after that, even one absence per month on an ongoing and consistent basis would eventually lead to termination. (*Id.*)

Mr. Arce's counsel did not have any questions for the VE. (Tr. 57.)

After the hearing, the VE was asked to complete an interrogatory. (Tr. 327.) The VE wrote that she relied on the Dictionary of Occupational Titles (DOT) and Selected Characteristics of Occupations (SCO). (*Id.*) She also relied on SkillTran software, specifically "job browser pro," to estimate job numbers. (*Id.*)

**E. State Agency Consultants**

A disability examiner (Tiffany McCane), a physician (Kathy Horava, D.O.), and a psychologist (Kristen Haskins, Psy.D.) reviewed Mr. Arce's claim at the initial review level in November 2023. (Tr. 80–88.)

Dr. Horava limited Mr. Arce to frequently lifting and carrying up to 10 pounds and occasionally up to 20 pounds. (Tr. 85.) He can stand or walk for six hours in a normal workday and can sit for six hours. (*Id.*) He has no postural, manipulative, or environmental limitations. (*Id.*)

Dr. Haskins found moderate limitations with respect to Mr. Arce's ability to interact with others; to concentrate, persist, and maintain pace; and to adapt and manage himself. (Tr. 84.) She found Mr. Arce's statements about his mental health symptoms to be partially consistent with the record, writing that Mr. Arce cares for his disabled son, does basic household chores, can drive himself places and travel alone, reported having friends, can manage a bank account and shop online, and reported having a hobby. (Tr. 84–85.) Dr. Haskins opined that Mr. Arce could perform simple, repetitive tasks in relatively static work environments where changes are easily explained.

(Tr. 86.) He can have occasional interaction with coworkers and supervisors, but should have no contact with the general public. (*Id.*) He can do "solitary work only." (*Id.*)

Based on these opinions, the consultants concluded that Mr. Arce could perform the work of an electronics worker, small products assembler, or housekeeping cleaner, and was not disabled. (Tr. 87.)

In a letter to Mr. Arce explaining this decision, the Agency wrote that the records showed that he is able to understand, remember, and concentrate adequately enough to carry out basic daily tasks like driving and being in public. (Tr. 110.) It wrote that his cardiac condition was stable with treatment and that he had normal motor functioning throughout his body. (*Id.*)

At the reconsideration level, these findings were reviewed by a different disability examiner (Amanda Hartzell), a physician (Mehr Siddiqui, M.D.), and a psychologist (Katherine Fernandez) between January and March 2024. (Tr. 89–98.)

Dr. Fernandez affirmed the mental RFC from the initial level, finding that Mr. Arce had alleged that his condition was worsening, but noting that a mental status examination was essentially normal and his overall functioning "appears essentially unchanged." (Tr. 96.)

Dr. Siddiqui also affirmed the initial level physical RFC findings. (Tr. 95–96.)

Based on these opinions, the consultants agreed with the initial level findings that work was available to Mr. Arce and that he was not disabled. (Tr. 97–98.)

In a letter to Mr. Arce explaining this decision, the Agency wrote that, despite his pain and discomfort, he retains the ability to perform some work related activities. (Tr. 122.) And despite any emotional problems he may experience, he maintains the ability to follow simple instructions, get along with others, and adapt to daily stresses. (*Id.*)

**F. Relevant Medical Evidence**[2]

Mr. Arce has a history of periodic abdominal pain. (Tr. 561, 557, 554.) He has consistently received treatment for anxiety, PTSD, and other mental health conditions, including a hospitalization. (Tr. 546, 542, 540, 539, 536, 534, 532, 1230–31, 1226, 1202–22, 512, 510, 1181, 1151.)

Mr. Arce has been treating for back pain since at least November 2018. (Tr. 575.) At that time, he was taking muscle relaxers and a nonsteroidal anti-inflammatory drug as needed. (*Id.*) On examination, he had normal range of motion but there was tenderness, pain, and spasm noted in the lumbar back. (Tr. 577.) He described that he was having increased pain when lifting his adult son and had noticed increased difficulty with movement and decreased standing tolerance with cooking. (Tr. 568.) He described the pain as an aching feeling in the back and legs. (Tr. 564–65.) At an examination in January 2019, he exhibited decreased range of motion and tenderness in the lumbar back. (Tr. 566.) But he had no positive musculoskeletal or pulmonary examination findings in February, April, June, and July 2019. (Tr. 562–63, 559, 553, 551.)

---

[2] Mr. Arce's assignments of error raise issues of law only (or nearly so). Indeed, Mr. Arce does not direct the Court to any medical records in support of his arguments. He wrote that "all medical evidence will be summarized in the arguments set forth below." (Pl.'s Br. at 3, ECF No. 9, PageID# 1480.) But the argument section of his brief on the merits does not contain any citation to a medical record, and he includes none in his reply brief either. (Reply, ECF No. 12.) I cautioned Mr. Arce in my initial order that "[i]f a factual assertion or legal argument relying upon the record is offered without citation, the Court likely will not consider it." (Order, ECF No. 5, PageID# 18.) Nevertheless, to aid in the Court's review, I summarize the records that may be relevant to a consideration of Mr. Arce's physical impairments. While the bulk of the medical records in the file relate to Mr. Arce's mental health conditions, he focused the written summary of his testimony in this appeal only on his alleged physical limitations, and his second assignment of error is specifically directed at the ALJ's consideration of his subjective statements that he cannot stand for more than 15 minutes or walk for more than 20 minutes. (*See* ECF No. 9, PageID# 1500.) I have thoroughly addressed Mr. Arce's legal arguments below and, in the interest of deciding this case on the merits, I have been comprehensive in summarizing the records that may be relevant to a factual argument about what the records show in this case as it relates to the arguments raised. But I also note that "[i]ssues adverted to in a perfunctory manner [by a party], unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). "[I]t is not for the court to search the record and construct arguments. Parties must do that for themselves." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017).

Mr. Arce complained of wheezing, joint pain, and neck and back pain and stiffness at a psychiatry appointment in January 2020. (Tr. 1236.) At that appointment, he also said that he takes care of his son and two dogs and cleans the house. (Tr. 1238.) He reported that he owned "muscle cars" and "drives them very fast," although sometimes he needs to pull over due to panic. (Tr. 1239.)

He repeated those physical complaints at a psychiatry appointment in February 2020. (Tr. 1231–32.) He reported that he does not drive due to anxiety. (Tr. 1233.) He underwent genotyping in February 2020. (Tr. 1286.)

Mr. Arce consulted with Holly Ferris, PA, on June 1, 2020, complaining of back pain. (Tr. 531.) He continued to describe an aching pain in the lumbar spine with associated symptoms of leg pain. (*Id.*) On examination, there was tenderness and pain over the lumbar spine but normal range of motion. (Tr. 531.) He was continued on a nonsteroidal anti-inflammatory, with acetaminophen and the use of heat and ice as needed. (*Id.*) He was referred for physical therapy. (*Id.*)

Mr. Arce started physical therapy a few days later. (Tr. 525.) He said he felt stiffness at all times, with sciatica approximately twice a month. (*Id.*) On examination, he had a slow gait cadence and reduced range of motion, although his strength was largely normal. (Tr. 526.) At a psychiatry appointment on the same day, he reported that he takes the dog out, performs yard work, helps around the house, and was trying to start a workout routine. (Tr. 1224.)

He continued physical therapy through June 2020, although he missed a couple appointments, with stable or slightly decreased reported pain and an improvement in his objective examination findings. (*See* Tr. 523, 521, 516.) He was discharged at the end of June, feeling like he had made no meaningful progress and complaining of pain in his neck and shoulders. (Tr. 517;

*see also* Tr. 515 (reporting frustration to his psychiatry professional with what he saw as a lack of progress and reporting continued significant thoracic spine pain)).

Mr. Arce continued to complain of neck and back pain and stiffness at his psychiatry appointments in July and August 2020. (Tr. 1197–98, 1193.) But he reported that he went on a relaxing family vacation to the area of Hocking Hills, Ohio and had been working on his car. (*See* Tr. 1189.)

In September 2020, he reported doing yard work, including repairing a fire pit. (Tr. 1186.)

In November 2020, the month that Mr. Arce alleges that he became disabled for purposes of this application, he endorsed back pain and said that he had been doing household chores and taking care of the dogs. (Tr. 1177, 1179.)

In January 2021, he did not complain of pain and said that he had begun lifting weights. (Tr. 1171.) He did not report pain in February 2021 either, and he told his psychiatry provider that he had been caring for his grandchildren. (Tr. 1167–68.) By May 2021, he was caring for his grandchildren "most days," leaving him fatigued by the end of the day. (Tr. 1162.) In July 2021, he was working out with a friend, caring for his grandchildren, and considering working toward a commercial driver's license, although he endorsed back pain. (Tr. 1157, 1159.) In November and December 2021, he did not complain of neck or back pain and said he was walking the dogs several times a day. (Tr. 1146–47, 1149, 1142, 1144.)

In March 2022, Mr. Arce complained of back pain, shortness of breath, and wheezing. (Tr. 1137.) He was continuing to watch his grandchildren frequently, and he was in the process of packing up his family's household items and moving homes. (Tr. 1138–39.)

Mr. Arce consulted with Ms. Ferris in June 2022 through telehealth with complaints of dental pain and heel pain in the bilateral heels. (Tr. 504.) A cursory physical examination was

normal, but again this was a telehealth appointment. (Tr. 505.) Mr. Arce was referred to a podiatrist and instructed to continue following with a dentistry practice. (Tr. 505–06.)

Mr. Arce did not complain of neck or back pain at a psychiatry appointment in August 2022. (Tr. 1131–32.) He was continuing to babysit his grandchildren, and he reported going to a park for radio-controlled cars, doing yard work and household chores, and caring for his disabled son. (Tr. 1133.)

Mr. Arce consulted with a podiatrist in the same month. (Tr. 500.) He complained of bilateral heel pain for the past year, which was present after getting out of bed and when standing after periods of rest. (Tr. 501.) He reported that the pain increases throughout the day, rating the pain as a 10 on a scale of 10. (*Id.*) On examination, he had decreased reflexes bilaterally and decreased range of motion in the ankles. (Tr. 502.) But he had full strength and intact sensation. (*Id.*) He was diagnosed with plantar fasciitis and prescribed arch supports, and x-ray imaging was ordered. (Tr. 503.)

A note from a psychiatry appointment in September 2022 reflects no neck, back, or other physical pain complaints. (Tr. 1126.) But Mr. Arce said that in general he had "lost energy for everything." (Tr. 1129.) He continued to report that he did yard work and household chores and cared for his disabled son. (*Id.*) The note from October 2022 was largely unchanged as it relates to Mr. Arce's physical complaints and activities of daily living. (Tr. 1122.) He complained of back pain in December 2022, but he was still noted as doing yard work and caring for his son and a grandson. (Tr. 1117–20.)

Mr. Arce raised no physical complaints at a psychiatry appointment in February 2023, but he reported chest pain and shortness of breath, and his blood pressure was "very high." (Tr. 1112, 1114.) According to the note, he continued to report that he was doing household chores and caring

for his son and a grandson. (Tr. 1114.) He was instructed to report to his primary care practice, an urgent care clinic, or an emergency department to address his blood pressure. (*Id.*)

Mr. Arce presented to the emergency department as instructed on February 9, 2023. (Tr. 494.) His blood pressure remained elevated, but a physical examination revealed no musculoskeletal tenderness and normal range of motion, including in the cervical back. (Tr. 496.) After a workup, he was prescribed medication and discharged to follow up with his primary care practice. (*Id.*)

He followed up with Ms. Ferris as instructed on February 14, 2023. (Tr. 492.) He continued to report chest and left arm pain. (*See id.*) He was referred to a cardiologist and an orthopedics practice. (Tr. 494.)

When he reported significant abdominal pain to his primary care practice on February 20, 2023, he was directed to go to the emergency department. (Tr. 491.) It does not seem that he went, because he reported similar issues to his primary care practice on February 23, 2023. (*Id.*) He was advised to seek treatment at an urgent care clinic. (*Id.*)

Mr. Arce consulted with Mohammed Taleb, M.D., on March 10, 2023, complaining of left sided chest pain, shortness of breath, and dizziness. (Tr. 488.) A physical examination was normal, but his blood pressure was 96 mm Hg systolic over 64 mm Hg diastolic, which the doctor characterized as "on the low side" for him. (*See* Tr. 488–90.) The doctor planned to schedule a stress test and echocardiogram. (Tr. 490.)

Mr. Arce complained of chest pain and shortness of breath at his psychiatry appointment on March 13, 2023. (Tr. 1107–08.) The mental status examination states that Mr. Arce continued to perform household chores and cared for his disabled son and his grandson, though I note that

he also reported feeling sick for most of the last week, endorsing fatigue and dehydration. (Tr. 1109.)

A psychiatric treatment note from April 2023 reflects no physical complaints, and Mr. Arce told his provider that the stress test and cardiac ultrasound had revealed no abnormalities. (Tr. 1102–04.) His activities of daily living, as reflected in the mental status examination, remained unchanged. (Tr. 1104.)

Mr. Arce presented to the emergency department on May 9, 2023, complaining of abdominal pain but denying musculoskeletal pain. (Tr. 476.) After a workup, he was admitted and ultimately underwent double or triple coronary artery bypass grafting surgery. (*See, e.g.*, Tr. 348–49, 475, 364, 368, 374, 388, 396, 403, 405, 430, 451, 455) (the surgical records seem to state that it was a triple bypass, but records like Tr. 1096 state that it was a double bypass; *but see* Tr. 1310 (reflecting report of triple bypass)). His post-operative treatment course was unremarkable, and he was discharged on May 16, 2023. (Tr. 460.)

By May 31, 2023, Mr. Arce had no shortness of breath, chest pain, or other concerning cardiopulmonary symptoms. (Tr. 351.) On June 6, 2023, Ms. Ferris noted that Mr. Arce's postoperative instructions were to lift no more than five pounds, but he was cleared to increase activity as tolerated. (Tr. 348.) He was referred to a new cardiologist, at his request. (Tr. 348, 351.)

At an appointment in July 2023, Mr. Arce reported that he was doing "very well" overall, with no chest pain, chest tightness, palpitations, or shortness of breath. (Tr. 1096.) On examination, there were no defects noted in the spine, and he moved all extremities with full range of motion. (Tr. 1099.) At an August 2023 psychiatry appointment, Mr. Arce did not endorse physical pain symptoms but said that he had fallen in the shower before his "heart attack" and bypass surgery, which fall led to a collapsed lung and acute kidney injury. (*See* Tr. 1308, 1310.)

By September 2023, Mr. Arce was complaining that his cardiac rehabilitation team was not challenging him enough, saying that he was doing more at home than they were having him do. (Tr. 1306.) But he also endorsed that he would prefer not to attend appointments due to his anxiety. (*Id.*)

Mr. Arce did not report physical pain complaints at a psychiatry appointment on October 4, 2023. (Tr. 1324–25.) The treatment note records that he had restarted working out at home and caring for his son. (Tr. 1327.)

At a psychiatry appointment on October 31, 2023, Mr. Arce said that he had occasional chest pains, which lasted only one to two seconds and which he believed were associated with musculoskeletal healing from his surgery. (*See* Tr. 1319.) But notably, he denied exertional chest pain, chest tightness, palpitations. or shortness of breath. (*Id.*) He reported chronic pain to the left medial thigh, where the surgical grafts were taken from, on a daily basis since the surgery. (*Id.*) On examination, his back was again noted to have no defects, and he could move his extremities with full range of motion. (Tr. 1322.) An ultrasound was ordered of the left leg, but otherwise he was continued on his medication regimen with blood tests ordered. (Tr. 1323.)

A psychiatry note from late November 2023 reflects a call from Mr. Arce's wife, describing that Mr. Arce had chest pain, but the practice attributed this to anxiety and directed them to report to the emergency department if it worsened. (Tr. 1336–37.)

A note from January 2, 2024, reflects that Mr. Arce was on a waitlist to begin psychotherapy. (Tr. 1352.) Later that month, Mr. Arce reported no back or neck pain at a psychiatry appointment. (Tr. 1347.) He continued to report that he was working out at home and caring for his son; he was also "fidgeting." (Tr. 1349.) Psychiatric notes from the end of the month reflect

reports that Mr. Arce was fainting, which he attributed to an interaction between his cardiac medication and his psychiatric medication. (Tr. 1366.)

At a psychiatry appointment in February 2024, Mr. Arce reported back pain and chest tightness. (Tr. 1361–62.) He reported "working out" and "caring for his son." (Tr. 1363.) His activities of daily living were unchanged in March 2024, although his mental health symptoms were worse as he had discontinued his medication for financial and insurance reasons. (*See* Tr. 1375–78.)

In April 2024, after the date last insured, Mr. Arce reported no physical complaints at a psychiatry appointment. (Tr. 1418–19.) He continued to report "workouts, caring for his son, [and] yard work." (Tr. 1420.)

Mr. Arce consulted with Diana Rodriguez-Salinas, M.D., on May 3, 2024, complaining of back pain. (Tr. 1415.) He described that he had been "very stiff the past 3 weeks" and that "his back pain brings him to his knees sometimes." (*Id.*) He said that it "hurt[s] when he turns and sneezes." (*Id.*) On examination, he had normal range of motion in the cervical back. (Tr. 1416.) He was referred to pain management professionals for the back pain. (Tr. 1417.)

On May 14, 2024, Mr. Arce reported that the occasional "knife-like" chest pain he was feeling was infrequent and lasted only a second or two at a most. (Tr. 1410.) He said that he "remains active, working on a car lately." (*Id.*) He denied exertional chest pain, chest tightness, palpitations, or shortness of breath. (*Id.*) He denied lightheadedness, dizziness, nausea, and vomiting. (*Id.*) He said that his blood pressure at home has been well controlled. (*Id.*) There was no significant lower extremity edema. (*Id.*) He reported that his previous issue with his left leg/thigh after bypass surgery had improved. (*Id.*) On examination, the musculoskeletal findings remained normal. (Tr. 1412.)

Mr. Arce consulted with Muhammad Hefzy, M.D., on May 22, 2024, complaining of chronic back pain. (*Id.*) He described daily pain in the lumbar spine that had been worsening over time, the quality of which was aching, burning, and stabbing. (Tr. 1406.) Mr. Arce rated the pain as an eight out of ten. (*Id.*) The doctor noted that an x-ray of the lumbar spine from 2018 showed "no severe pathology." (*Id.*; *see also* Tr. 1428–29 (revealing mild facet arthropathy at the L5–S1 level and mild degenerative changes at L5–S1), Tr. 1425–28).

He returned to Dr. Hefzy on May 28, 2024, reporting no physical pain. (Tr. 1401–02.) He was watching his grandson, working out, caring for his son, and doing yard work. (Tr. 1402–03.)

On June 7, 2024, Mr. Arce reported that he had been having back pain, potentially relating to falling "out of the shower" when he had his "heart attack." (*See* Tr. 1398.)

On June 26, 2024, Dr. Hefzy wrote that Mr. Arce reported pain at an eight out of ten in the lumbar spine that was "aching, burning, shooting and stabbing." (Tr. 1388.) Mr. Arce reported that home treatment had provided limited relief. (*Id.*) Dr. Hefzy continued to discuss with Mr. Arce "continued conservative management" like physical therapy, chiropractic care, and acupuncture, and interventional therapy like epidural steroids or possible medial branch nerve blocks or radiofrequency ablation. (Tr. 1390–91.) They also discussed surgical evaluation. (*Id.*)

In June 2024, Mr. Arce complained of chest tightness and back pain. (Tr. 1391–91.) He said his "back is really bothering him more and more" and an "MRI showed some bulging discs." (Tr. 1393.) He was in the process of moving houses and said that "[e]verything is overshadowed by the pain in his back." (*Id.*) He said the pain was "limiting how much he can do with his son." (*Id.*)

A thoracic MRI in October 2024 showed some degenerative changes and "microtrabecular injury/developing Schmorl's nodes," with a "[r]ounded area of signal abnormality within T10 vertebral body . . . possible atypical hemangioma." (Tr. 1445.)

## IV. THE ALJ'S DECISION

The ALJ determined that Mr. Arce last met the insured status requirements of the Social Security Act on March 31, 2024. (Tr. 20.) The ALJ next determined that Mr. Arce had not engaged in substantial gainful activity from the amended onset date of November 21, 2020, through the date last insured. (*Id.*)

The ALJ next determined that Mr. Arce had severe impairments of (1) heart disease, status post coronary artery bypass graft (CABG); (2) right lower extremity deep vein thrombosis; (3) anxiety; (4) major depressive disorder; and (5) post-traumatic stress disorder (PTSD). (*Id.*)

The ALJ further found non-severe impairments of mild diverticulitis, obesity, mood disorder secondary to sleep apnea and obesity, hypertension and hyperlipidemia, umbilical hernia, asthma or chronic obstructive pulmonary disease, and left distal Achilles enthesopathy. (Tr. 20–21.) With respect to Mr. Arce's back conditions, the ALJ stated the following:

> Notably, the claimant had alleged back issues (*testimony*). His record reported chronic back pain in June 2022 and was noted for probably early degenerative joint disease by history[;] there was also [a] reported gait problem albeit no exam findings to correspond [to] the same. He had reported back pains in March 2023 as well as left lower quadrant pains at that time.
>
> Records in the relevant period showed no significant findings regarding the claimant's back. There was some imaging indicating degenerative changes including lumbosacral spondylosis without myelopathy in June 2024. In October 2024, his MRI showed degenerative changes and microtrabecular injury; there was also a rounded area of signal abnormality within T10 vertebral body, 0.9 cm, possible atypical hemangioma. These findings could reasonably support the mild symptoms he was experiencing prior to the date last insured; his obesity certainly could have been a contributing factor.

(Tr. 21) (internal record citations omitted).

The ALJ noted that he considered the limiting effect of all of these impairments when determining the residual functional capacity. (*Id.*)

The ALJ next determined that none of Mr. Arce's impairments through the date last insured, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Arce had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 24.) Specifically, he cannot climb ladders, ropes or scaffolds, but he can frequently climb ramps and stairs. (*Id.*) He can occasionally crawl. (*Id.*) He can occasionally use the bilateral lower extremities for the operation of foot controls. (*Id.*) He must avoid more than occasional, concentrated exposure to moving mechanical parts and high exposed places. (*Id.*) He must avoid more than occasional concentrated exposure to irritants like fumes, odors, dust, and gases. (*Id.*)

With respect to non-exertional limitations, Mr. Arce can understand, remember, and carry out simple instructions for work not requiring a specific production rate or hourly quotas. (*Id.*) He is capable of using judgement to make simple work-related decisions, with occasional changes in a routine work setting. (*Id.*) Furthermore, he can have no interaction with the general public but can engage in isolated work with occasional interaction with coworkers and supervisors. (*Id.*)

The ALJ found that Mr. Arce had no past relevant work and was 48 years old on the date last insured. (Tr. 30–31.) He found that Mr. Arce had a limited education. (Tr. 30.)

The ALJ then determined that—considering Mr. Arce's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a merchandise marker (DOT 209.587-034), routing clerk (DOT 222.687-022), and mail clerk (DOT 209.687-026). (Tr. 31.)

Accordingly, the ALJ determined that Mr. Arce is not disabled. (Tr. 33.)

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations

direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. <u>Analysis</u>

Mr. Arce raises two assignments of error in this appeal, both presenting purely (or nearly so) legal issues.

**1. First Assignment of Error – SSR 24-3p**

In his first assignment of error, Mr. Arce argues that a relatively new Social Security Ruling, SSR 24-3p, is contrary to law and was promulgated in violation of the Administrative Procedure Act. *See* SSR 24-3p, 89 Fed. Reg. 97158-01, 2024 WL 4988840 (Dec. 6, 2024). This is an argument that Mr. Arce's counsel's law firm has raised in substantially the same manner in at least two other courts this summer. *See Benjamin C. v. Comm'r of Soc. Sec.*, No. 1:25-cv-1341-RLH, 2026 WL 1682580 (C.D. Ill. June 10, 2026); *Lisa W. v. Bisignano*, No. 8:25-cv-2804, 2026 WL 2024675 (D. Md. July 14, 2026).

After noting that the "administrative structure and procedures" used by the SSA "are of a size and extent difficult to comprehend"—*Richardson v. Perales*, 402 U.S. 389, 399 (1971)—the Central District of Illinois succinctly set forth the relevant statutory and regulatory background, as follows:

> That structure encompasses myriad sources of law. Three are relevant here.
>
> There is, of course, the Social Security Act itself. *See* 42 U.S.C. §§ 301–1397mm. Although the Act defines who is eligible for benefits, *see* 42 U.S.C. § 423(d)(1)(A), it offers little guidance to the SSA about how to adjudicate individual applications. Instead, it entrusts the Commissioner with "exceptionally broad authority," *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987), to implement the Act's provisions by adopting "reasonable and proper rules and regulations," 42 U.S.C. § 405(a). In creating such regulations, the Commissioner must generally adhere to the Administrative Procedure Act's (APA) notice-and-comment procedures—a process in which agencies broadcast their intent to adopt a new rule and field public comments about it. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). This notice-and-comment process applies whenever an agency adopts "substantive rules of general applicability." *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 168 (1st Cir. 2021) (quoting 5 U.S.C. § 552(a)(1)(D)).
>
> Aside from federal statutes and regulations, the SSA also issues its own rulings: "Social Security Rulings" (SSR). SSRs are "interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They "do not have the force of law or properly

> promulgated notice and comment regulations," but are nonetheless "binding on all components of the Social Security Administration." *Id.* (quoting 20 C.F.R. § 402.35(b)(1)). [*See* 20 C.F.R. § 402.160(b)(1).]
>
> . . .
>
> In short, federal statutes establish the Act's broad purpose, regulations implement that purpose, and SSRs clarify how the SSA interprets the regulations.

*Benjamin C.* at *1–2, 2026 WL 1682580 (bracketed alteration added).

The SSA published SSR 24-3p in December 2024. The Ruling concerns the use of occupational information and vocational expert evidence in the disability determination process. It rescinded an earlier Ruling from 2000, SSR 00-4p. SSR 00-4p, 2000 WL 1898704. Both rulings address Steps Four and Five of the sequential evaluation process. Under the old Ruling, ALJs had to "[i]dentify and obtain a reasonable explanation [from the vocational expert] for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles (DOT)" and "[e]xplain in the determination or decision how any conflict that has been identified was resolved. *See* SSR 00-4p, 2000 WL 1898704, at *1. Under the new Ruling, the SSA no longer requires ALJs to identify and resolve conflicts between a VE's occupational information and the DOT. *See* SSR 24-3p, 89 Fed. Reg. 97158-01, at 97159.

The Agency explained its reasoning as follows:

> We continue to recognize the DOT as a valid and reliable source of occupational information, and we will continue to use it in adjudication. However, we acknowledge that the DOT is not the only reliable source of occupational information. . . . The requirements of SSR 00-4p make it difficult to use these other sources, because it is not clear how a VS, VE or adjudicator can fulfill the requirement to identify and resolve conflicts with the DOT when primarily using a data source that is, structurally, very different from the DOT. We do not want to discourage use of occupational information that is reliable and commonly used in the vocational profession.

*Id.*

The Agency also acknowledged that requiring ALJs to identify and explain conflicts with the DOT was "time consuming" and had "led to unnecessary remands . . . ." *Id.*

After SSR 24-3p, VEs are permitted to "use any reliable source of occupational information that is commonly used by vocational professionals and is relevant under [SSA's] rules, along with their professional knowledge, training, and experience." *Id.* And ALJs must "weigh the VE . . . evidence in the context of the overall record and determine whether it can support a conclusion at step four or step five." *Id.* at 97159–97160.

Mr. Arce contends that SSR 24-3p is not an interpretive rule but rather a legislative rule that should have been promulgated only after the notice and comment rulemaking procedures of the Administrative Procedure Act (APA). *See, e.g.*, *Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018). The argument goes that, because the Ruling was not issued pursuant to notice-and-comment rulemaking, it is invalid. *See id.*

He argues that SSR 24-3p requires a claimant or their representative, who may not be a lawyer, to "cross-reference[] and validat[e] VE job evidence" at the hearing and identify any conflicts. (Pl.'s Merits Br. at 7, ECF No. 9, PageID# 1484.) If the claimant fails to appreciate a conflict, he says, the issue will be forfeited. *Id.*; *but see* SSR 24-3p, 89 Fed. Reg. 97158, at 97160 ("At the hearing level, *when the claimant is represented*, we expect the representative to raise any relevant questions or challenges about the VE's testimony at the time of the hearing and to assist in developing the record through appropriate questions to the VE.") (emphasis added).

Mr. Arce characterizes the Ruling as creating a "whole new framework" for disability hearings, as "[t]hese mandatory absolutes for challenging VE testimony, as to both content and timing, never previously existed." (*Id.* at PageID# 1488–89.) He further argues that the Ruling conflicts with SSR 96-9p, which states that "Whenever a VE is used, the individual has the right

to review and respond to the VE evidence prior to the issuance of a decision." SSR 96-9p, 1996 WL 374185, at n.8 (July 2, 1996). And he argues that it conflicts with 5 U.S.C. § 556(d), which provides that "A party is entitled . . . to submit rebuttal evidence[] and to conduct such cross-examination as may be required for a full and true disclosure of the facts," and with Agency regulations at 20 C.F.R. §§ 404.1740(b)(3) and 416.1540(b)(3), which require agency representatives to conduct their dealings "in a manner that furthers the efficient, fair, and orderly conduct of the administrative decision-making process."[3]

The Commissioner responds to Mr. Arce's legal arguments substantively, contending that SSR 24-3p is an interpretive rule, not a legislative one. (Comm'r Merits Br. at 12–17, ECF No. 11, PageID# 1523.) He also responds to Mr. Arce's practical arguments, defending SSR 24-3p as a way to *facilitate* cross-examination of a VE at the hearing and pointing out that "nothing in the ruling . . . establishes a bright-line rule prohibiting representatives from reflecting upon the vocational testimony after the hearing has adjourned and then submitting challenges to the ALJ after the hearing." (*Id.* at PageID# 1521.)

But more fundamentally, the Commissioner argues that Mr. Arce's brief fails to show any error connected to his actual claim. The Commissioner points out, accurately, that Mr. Arce "does not argue that the ALJ erred in his vocational conclusions," Mr. Arce's counsel asked no questions of the VE at his hearing, he does not argue that the ALJ's or VE's findings were flawed or unsound, and he does not claim to have been forced to forfeit anything. Moreover, the Commissioner contends that even if Mr. Arce had alleged an error, he would have had to also show that the error was not harmless to obtain a remand. The Commissioner insists that, under these circumstances,

---

[3] Anticipating what he believed would be the Commissioner's response to these arguments, Mr. Arce also set forth a lengthy argument on deference in his merits brief. (Pl.'s Merits Br. at 15–20, ECF No. 9, PageID# 1497.)

Mr. Arce's appeal asks the Court for an advisory opinion on an abstract legal argument completely disconnected from his actual disability application.

In reply, Mr. Arce argues that the Agency's violation of the APA in enacting SSR 24-3p had an effect on the procedure used in the Agency's consideration of his application, giving him standing to challenge it and giving the Court the authority to address his arguments. He contends that "the inability to question the VE's testimony after the hearing prevents any meaningful cross-examination and requires representatives to essentially become VEs themselves," which would "hinder any claimant, including Plaintiff, from being able to engage in a meaningful defense at the time of the hearing." (Reply Br. at 2, PageID# 1531.) He says if SSR 24-3p been put through a notice-and-comment procedure, there is no certainty the Agency would have adopted it. And if the Agency had not adopted it, the argument goes, then the VE in his case would have testified under the old SSR 00-4p, potentially altering her answers.

After careful consideration, I agree with the Commissioner and the other two courts that have recently considered similar challenges. Addressing Mr. Arce's substantive APA challenge to SSR 24-3p would amount to issuing an advisory opinion, he lacks standing to press the argument, and the Court should overrule his assignment of error for that reason.[4] *See Benjamin C.*, 2026 WL 1682580, at *4–6; *Lisa W.*, 2026 WL 2024675 at *5–7.

"Federal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). They do not adjudicate

---

[4] The Commissioner points out that Mr. Arce did not state an APA claim in his Complaint, seek an injunction, or seek leave to amend the Complaint. (*See* Comm'r Merits Br. at 12 n.4, ECF No. 11, PageID# 1518; *see also generally* Compl., ECF No. 1.) The Commissioner argues that "[a]ny APA claim is [therefore] not properly before the Court." The Commissioner did not cite any caselaw in support of that argument, but in any event because my recommendation rests on other grounds, I do not address the argument. *See also Benjamin C.*, 2026 WL 1682580, at *3 (finding the omission of any mention of the APA in the complaint "unusual" but "perhaps excusable," and ultimately resolving a similar argument on the grounds that it called for an advisory opinion).

hypothetical or abstract disputes, and they do not issue advisory opinions. *Id.* Instead, they decide "Cases" and "Controversies," U.S. CONST. art. III, § 2, cl. 1, meaning matters in which there is a "real and substantial controversy" capable of "specific relief." *Hargrove v. Healy*, 155 F.4th 530, 532 (6th Cir. 2025) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam)); *see also Chapman v. Tristar Products, Inc.*, 940 F.3d 299, 303 (6th Cir. 2019) ("[T]he U.S. Constitution does not authorize federal courts to decide theoretical questions.") (internal quotation marks and citation omitted).

Thus, courts "cannot decide the merits of a claim for relief unless some party pressing the claim has standing to bring it." *Chapman*, 940 F.3d at 304.

Here, Mr. Arce asks the Court to reverse the Commissioner's decision without remanding, "on the basis that the Agency is enjoined and restrained from implementing SSR 24-3p against [him] until [it] has gone through proper notice-and-comment procedures." (Pl.'s Merits Br. at 21, ECF No. 9, PageID# 1498.) But he fails to "connect the dots" in a concrete enough way between the promulgation of SSR 24-3p and the Commissioner's decision denying him benefits. *See Benjamin C.*, 2026 WL 1682580, at *4.

To demonstrate standing, a party must show an "injury in fact" that is (1) both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) "fairly traceable to the challenged action of the defendant," and (3) redressable by a favorable decision of the court. *Chapman*, 940 F.3d at 304 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61). It is Mr. Arce's burden to show that he has standing. *Id.*

Mr. Arce was denied DIB benefits, but he has not shown that the denial is fairly traceable to the SSA's adoption of SSR 24-3p or that any injury he suffered is likely to be redressable by a favorable decision.

He does not once cite the administrative record in the argument section setting forth his first assignment of error. As the court noted in *Benjamin C.*:

> The notable absence of a discussion about any aspect of the ALJ's opinion confirms that [the claimant] was not injured by SSR 24–3p. An identical brief could have been filed in virtually any other social security appeal in which the claimant made it past step four.

*Benjamin C.*, 2026 WL 1682580, at *5 n.4.

That may have been exactly what happened here, as Mr. Arce's assignment of error makes essentially identical arguments, using at least some of the same language as that reported in *Benjamin C.* and *Lisa W.* But in any event, I agree with the reasoning that Mr. Arce's failure to cite a single portion of the ALJ's decision, the hearing transcript, the VE's interrogatory, or any other part of the administrative transcript in the argument section discussing his first assignment of error strongly supports the conclusion that Mr. Arce was not injured by SSR 24-3p in a way that is concrete, particularized, and redressable in a meaningful way.

Indeed, a consideration the facts shows that he was *not* injured by SSR 24-3p. He wishes for the VE to have testified under SSR 00-4p, but the ALJ asked the VE at the hearing to identify if her testimony had been consistent with the DOT and SCO, and the VE testified that it had "except in areas not addressed" by those resources. (Tr. 57.) The VE then identified those areas and explained the basis for her testimony about those areas. (*Id.*) Mr. Arce does not explain how this hearing testimony would have been any different under the older Ruling. *Compare Lisa W.*, 2026 WL 2024675, at *5 (the claimant at least tried to connect the argument to an ALJ error, urging that the ALJ erred by failing to resolve an apparent conflict between specific parts of the RFC and the job requirements of the DOT).

This is also not a case where an ALJ refused to adequately consider post-hearing evidence challenging the VE's testimony. *Compare Desvarennes v. Comm'r of Soc. Sec.*, 817 F. Supp.3d

1329, at 1333 (S.D. Fla. Jan. 26, 2026). And it is not a case where Mr. Arce was denied the opportunity to challenge the VE's testimony after the hearing.

To the contrary, when the ALJ requested and received additional post-hearing evidence from the VE in the form of an interrogatory, the ALJ specifically informed Mr. Arce's counsel as follows before admitting the additional VE evidence:

> You may submit any or all of the following: written comments concerning the evidence, a written statement as to the facts and law you believe apply to the case in light of that evidence, and any additional records you wish me to consider . . . . You may also submit written questions for the author(s) of the new evidence. You may also request a supplemental hearing.

(Tr. 330.)

Mr. Arce did not submit any post-hearing evidence, and indeed his counsel specifically stated that he had no objection to the admission of the VE's interrogatory. (*See* Tr. 335.)

Where Mr. Arce makes no attempt to connect SSR 24-3p to a particular alleged error affecting the Commissioner's decision, I agree with the reasoning of *Benjamin C.* and *Lisa W.* that all that is left of Mr. Arce's injury argument is an "abstract chain of speculative reasoning" such that addressing the argument on the merits would "constitute an advisory opinion." *See Lisa W.*, 2026 WL 2024675, at *6.

Mr. Arce's claim is also based on a "speculative theory of redressability; that is, the ALJ *might* have reached a different conclusion had several other speculative events taken place—events for which there is no supporting evidence, nor any supportive argument." *Id.*

I agree with the court's reasoning in *Lisa W.* that:

> [t]he Court is not prepared to assume that (1) the SSA would not adopt SSR 24-3p by way of the APA's notice-and-comment procedure; (2) that had the SSA not adopted SSR 24-3p by way of the APA's notice-and-comment procedure, it would have instead reinstated . . . SSR 00-4p; (3) that had SSA reinstated SSR 00-4p, the VE would have proposed different jobs in the national economy; and (4) that a hypothetically different VE testimony would change the ALJ's ultimate conclusion here, or ultimately redress the alleged harm. . . . Plaintiff's logic is far too speculative to cross the line from asking for mere "judicial input" to advancing a redressable challenge to an ALJ's reasoning.

*Id.*[5]

Because Mr. Arce cannot show a concrete and particularized injury that is fairly traceable to the SSA's adoption of SSR 24-3p and redressable by a favorable decision, he lacks standing to press this argument—either through the APA or through the Social Security Act—and any decision on the merits would amount to an improper advisory opinion.

Mr. Arce insists that this issue is a "grav[e]" one, with "mass applicability to SSA disability cases nationwide," imploring the Court to give its "judicial input" on the legality of SSR 24-3p. He cites commentary from practitioners on the matter. (*See* Pl.'s Merits Br. at 12, 14, PageID# 1489, 1491). But "[m]atters of great public interest are precisely the kinds of issues that demand the federal courts to be most vigilant" to exercise only the powers the Constitution gives them. *Fialka-Feldman v. Oakland Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011).

I am convinced that an opinion addressing the merits of Mr. Arce's first assignment of error is beyond those powers, and therefore I recommend that the Court overrule it.

---

[5] I considered that reversing the Commissioner's decision for the award of benefits (instead of remanding) would have the practical effect of giving Mr. Arce what he seeks in the case, but the same could be said of any such decision in a § 405(g) Social Security case, no matter the alleged error. But even if Mr. Arce's request were to cure the redressability issue, he would still have failed to show that the injury he complains of is fairly traceable to the SSA's promulgation of SSR 24-3p.

**2. Second Assignment of Error – Subjective Complaints**

In his second assignment of error, Mr. Arce contends that the ALJ failed to adequately consider Mr. Arce's assertion that he is unable to stand for more than 15 minutes or walk for more than 20 feet. (Pl.'s Merits Br. at 23, ECF No. 9, PageID# 1500.) He admits that the ALJ acknowledged his alleged limitations, but he says that the ALJ did not explain why he rejected those allegations except for a "boilerplate recitation" that "the intensity, persistence, and limiting effects of these symptoms" are "less than fully persuasive to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.*, citing Tr. 30.) He argues that the alleged error was not harmless because the VE testified that a limitation to sedentary work would be work-preclusive. (*Id.*, citing Tr. 56.) He further alleges that the ALJ's reference to the RFC here shows that the ALJ had improperly "formulated the RFC prior to considering Plaintiff's subjective complaints." (*Id.* at PageID# 1501.)

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id.* If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id.* at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration,

frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

The Commissioner defends the ALJ's decision, pointing to reasoning earlier in the decision that he says show that the ALJ "spent significant time discussing Plaintiff's subjective complaints."

(Comm'r Merits Br. at 18, ECF No. 11, PageID# 1524, citing Tr. 25–26.) The Commissioner points out that Mr. Arce "does not cite a single instance of antalgic gait in his brief." (*Id.* at PageID# 1526.) And he argues that further support for the ALJ's consideration of Mr. Arce's subjective symptoms can be found in the fact that the RFC that was more restrictive than any medical source found. (*Id.*)

In reply, Mr. Arce asserts that the Commissioner's defenses rely only on "*post hoc* rationalizations." (Reply Br. at 10, ECF No. 12, PageID# 1539.)

After careful consideration, I agree with the Commissioner that the ALJ adequately considered Mr. Arce's subjective statements about his ability to stand and walk, and that the ALJ's conclusions are supported by substantial evidence.

Mr. Arce's entire argument rests on one sentence in the ALJ's decision. But the ALJ's decision must be read as a whole and with common sense. *Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021); *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

Reading this decision as a whole, the decision reflects that the ALJ considered Mr. Arce's allegations that he cannot stand or walk long enough to maintain employment.

The ALJ outlined the regulatory requirements for evaluating subjective symptoms. (Tr. 24–25.) The ALJ then described Mr. Arce's testimony regarding his limitations, specifically acknowledging his testimony about cardiac treatment and back problems after falling in the shower. (Tr. 25.) The ALJ acknowledged the testimony that Mr. Arce does not drive because he cannot turn his neck, that his legs "give out," that he needs to sit to get dressed, and that he cannot bend at the waist to sit. (*Id.*) He acknowledged that Mr. Arce said he can walk only 20 feet before

needing a break, can stand for 15 minutes, has a hard time lifting objects, and gets "winded" on stairs or when doing physical tasks. (Tr. 25–26.) He acknowledged that Mr. Arce testified that his gait makes it difficult to shop with his wife and that he gets stiff when he sits for too long. (Tr. 26.) He acknowledged the testimony that Mr. Arce anticipated receiving back injections and needing surgery soon. (Tr. 25.)

Then, over the course of three pages, the ALJ summarized the objective medical evidence and described Mr. Arce's course of treatment, which included mental health treatment, physical health treatment, and his statements to providers about his symptoms. (Tr. 26–28.) Earlier in the decision as well, the ALJ had discussed Mr. Arce's physical impairments in detail when deciding which were medically determinable and severe. (Tr. 20–21.) Most relevant to his arguments in this case, the ALJ stated as follows about his back issues:

> Notably, the claimant had alleged back issues (*testimony*). His record reported chronic back pain in June 2022 and was noted for probably early degenerative joint disease by history (there was also reported gait problem albeit no exam findings to correspond the same). He had reported back pains in March 2023 as well as left lower quadrant pains at that time.
>
> Records in the relevant period showed no significant findings regarding the claimant's back. There was some imaging indicating degenerative changes including lumbosacral spondylosis without myelopathy in June 2024. In October 2024, his MRI showed degenerative changes and microtrabecular injury; there was also a rounded area of signal abnormality within T10 vertebral body, 0.9 cm, possible atypical hemangioma. **These findings could reasonably support the mild symptoms he was experiencing prior to the date last insured; his obesity certainly could have been a contributing factor.**
>
> . . .
>
> Based upon the medical evidence of record, these medically determinable impairments, considered singly or in combination including obesity, do not cause more than a minimal limitation on the claimant's ability to perform basic work activities and are . . . determined as nonsevere.

(Tr. 21) (emphasis added) (internal citations to the record omitted); *see also* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . ."); 20 C.F.R. § 404.1529(c)(3)(iv)(v); SSR 16-3p, 2017 WL 5180304, at *9 ("[If] the . . . extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.").

Throughout the opinion, the ALJ referred repeatedly to Mr. Arce's activities of daily living, including his reports that he is able to do chores, care for his disabled son, babysit grandchildren, and move to a new house. (*E.g.*, Tr. 22–23, 27.)

And when the ALJ considered the opinions of the state agency medical consultants, he concluded that they were only partially persuasive, reasoning that "additional medical evidence received . . . at the hearing [level], **as well as evidence in the form of testimony at the hearing**, . . . justif[y] a conclusion that the claimant's impairments are more limiting than was concluded." (Tr. 28) (emphasis added). The ALJ specifically referred to Mr. Arce's reports of "some mild but chronic back pains," which were somewhat supported by "his later imaging." (Tr. 29.) The ALJ also reasoned that Mr. Arce's "**complaints of pain**, deep vein thrombosis in the lower extremities, and respiratory and cardiovascular complaints . . . warranted further postural and environmental limits and restrictions in foot control use with the lower extremities in the relevant period." (*Id.*) (emphasis added). But the ALJ found the opinions persuasive in that Mr. Arce could perform work at the light exertional level with the additional limitations of the RFC, reasoning that the conclusion was "supported by the evidence relied upon in the physical medical summaries on initial and reconsideration with reference to the record." (*Id.*)

It was only after all of this discussion and analysis that the ALJ wrote the single sentence upon which Mr. Arce bases his argument. I find no basis to reverse where the ALJ thoroughly and accurately discussed Mr. Arce's daily activities; the location, duration, frequency, and intensity of his pain and other symptoms; the factors that precipitate and aggravate symptoms; the treatment Mr. Arce received (or lack thereof); relevant medical imaging; and other factors concerning his functional limitations and restrictions. *See* SSR 16-3p, 2016 WL 1119029 at *7–8 (Mar. 16, 2016).

Contrary to Mr. Arce's contention, the ALJ's reasoning is clear for finding Mr. Arce's disabling standing and walking symptoms to be inconsistent with the record, where the ALJ explained that imaging only somewhat supported mild complaints and where Mr. Arce continued significant activities of daily living—albeit with support from family—during the relevant period.

Mr. Arce does not make a substantial-evidence argument. He cites to no medical record in support of his second assignment of error. He points to no inaccuracy in the ALJ's recitation of the record evidence, and he points to nothing in the record (beyond his testimony) that he contends is inconsistent with the RFC.

Nevertheless, I note that under these circumstances, and where I find the ALJ's summary of the evidence and his conclusions to be accurate and reasonable, I find that the ALJ's conclusions and RFC are supported by substantial evidence. *See Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022) ("A plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints.").

Therefore, I recommend that the Court overrule Mr. Arce's second assignment of error.

As there is no basis to reverse or remand, I recommend that the Commissioner's decision be affirmed.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: August 20, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and

recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).